IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )       Criminal Action No.
                                )       05-00288-01-CR-W-DW
BRIAN A. OWSLEY,                )
                                )
            Defendant.          )

## REPORT AND RECOMMENDATION TO DENY
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
## AND HIS MOTION TO SUPPRESS STATEMENTS

Before the court are defendant's motion to suppress
evidence on the ground that the initial warrantless stop was
not lawful, and his motion to suppress statements on the
grounds that the initial stop was not lawful, defendant's
statement was not voluntary, and the length and nature of
his custody and interrogation were inherently coercive. I
find that the initial stop of defendant's car was proper,
Officer Onik was justified in ordering defendant out of the
car, Officer Onik was justified in drawing his weapon, the
time spent waiting for the K-9 unit was not unreasonable,
Officer Onik had probable cause to search defendant's car,
defendant voluntarily consented to the search of his car,
defendant knowingly and voluntarily waived his <u>Miranda</u>
rights, and defendant voluntarily provided a statement.
Therefore, defendant's motions to suppress should be denied.

## I.  BACKGROUND

On August 2, 2005, defendant was stopped because his temporary tag was improperly displayed in the upper middle rear window of his vehicle and the officer could not see the dealer number or the expiration date on the tag because of the window tint.  The officers detected a strong odor of marijuana coming from the car.  Officer Onik asked defendant if there was anything in the car, and defendant said, "No, man, search it."  With the aid of a drug-trained dog, officers recovered cocaine base from the insider driver door panel of defendant's vehicle.  Later at the police station, defendant was advised of his <u>Miranda</u> rights, signed a waiver, and gave a statement.

On August 3, 2005, a criminal complaint was filed charging defendant with one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  On August 17, 2005, an indictment was returned charging the same offense.  Defendant filed the instant motions to suppress on November 9, 2005.  On November 18, 2005, the government filed responses, arguing that defendant was stopped for a valid traffic violation, the strong odor of marijuana emanating from the defendant and his vehicle gave officers probable cause to search the

2

car, defendant consented to the search, and defendant's statement was voluntary.

On November 21, 2005, I held an evidentiary hearing on defendant's motions to suppress statements and evidence. The government appeared by Assistant United States Attorney Matthew Wolesky. The defendant was present, represented by John Spencer. The government called the following witnesses:

1. Officer Christopher Onik, Kansas City, Missouri, Police Department, Metro Patrol Division

2. Officer Jacob Becchina, Kansas City, Missouri, Police Department, Metro Patrol Division

3. Officer David Edwards, Kansas City, Missouri, Police Department, K-9 Unit

4. Detective Cory Horalek, Kansas City, Missouri, Police Department, Drug Enforcement Unit

In addition, the following exhibits were marked and admitted into evidence:

P. Ex. 1:       In-car video patrol tape of defendant's stop

P. Ex. 2:       Consent to Search form, listing items seized from defendant's vehicle

P. Ex. 3:       <u>Miranda</u> waiver form

P. Ex. 4:       Defendant's typed statement

Court's Ex. 1: Inventory of items seized from defendant's person

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.     On August 2, 2005, Officer Christopher Onik was working patrol with Officer Jake Becchina in the area of 80th and Troost (Tr. at 4, 50).  That area has been targeted for patrol by the police department because it is an area heavy with illegal drug sales and weapons, a lot of people with outstanding warrants are found in that area, assaults and homicides occur in the area, and there are other crimes that frequently occur there (Tr. at 4-5, 52).

2.     At approximately 11:30 p.m. on August 2, 2005, the officers observed a man named Brian Vaughn speaking with a man later identified as defendant Owsley (Tr. at 5, 51). They were in the parking lot of 8001 Troost (Tr. at 5). Brian Vaughn is a known burglar and a man who participates in thefts from automobiles (Tr. at 5).  For the three years Officer Onik has been on patrol, he has arrested Vaughn on numerous occasions (Tr. at 5-6).  Officer Becchina had also arrested Vaughn for drug and drug paraphernalia offenses (Tr. at 51, 52).  Vaughn is known as a "middle man" in the drug business (Tr. at 6, 51).  He sets up drug deals between

4

people interested in buying and people interested in selling (Tr. at 6, 51).

3. The officers observed Vaughn on foot talking to defendant, with his hands inside defendant's car; then he walked to an orange Explorer; then he walked back to defendant's car (Tr. at 6-7, 45, 51, 53). Defendant appeared to be shaking defendant's hand or handing something to him (Tr. at 51). The officers believed there was possibly an illegal drug transaction taking place (Tr. at 45).

4. During these back-and-forth conversations, Officers Onik and Becchina drove through the parking lot to try to get the tag number of defendant's car, a GMC Envoy (Tr. at 7). The Envoy did not have a license plate on it, and the temporary tag was improperly displayed by being in the upper middle portion of the rear window (Tr. at 7-8, 54). The temporary tag is supposed to be displayed in the upper left corner of the car's window (Tr. at 8). It is also a requirement that the writing on the tag be visible for a distance of 50 feet (Tr. at 8). The officers were unable to read the temporary tag because it was placed behind a thick strip of window tinting (Tr. at 8-9, 26, 54;

P. Ex. 1). The tinting was darker than factory tinting (Tr. at 68).

    5.    Vaughn walked away from the Envoy, and the Envoy pulled out of the parking lot headed northbound on Troost (Tr. at 9, 54). The officers followed the car with their emergency lights activated, and defendant turned eastbound on 78th Street and stopped (Tr. at 9, 54). Officer Onik pulled in behind defendant's car (Tr. at 9-10, 54; P. Ex. 1).

    6.    Officer Onik approached the driver's window and identified himself as a police officer (Tr. at 11, 55). Defendant was the only person in the car (Tr. at 10). Officer Onik noticed a very strong odor of marijuana emanating from the car (Tr. at 11, 37, 41).

    7.    Officer Onik told defendant he had been pulled over because of the improper display of his temporary tag (Tr. at 12). He asked defendant for his identification (Tr. at 12). Defendant looked at Officer Onik, then looked back into the car, then leaned forward rather quickly reaching his right hand to his rear pocket (Tr. at 12). Officer Onik drew his weapon and asked defendant to step out of the car (Tr. at 12, 13, 34).

6

8. Officer Onik drew his weapon because he believed defendant had plenty of time to get his driver's license out of his wallet as Officer Onik was inspecting the temporary tag and approaching the car (Tr. at 12, 36). According to the tape of the incident, defendant's car was stopped at 11:37:05 p.m. (five seconds past 11:37 p.m.), and Office Onik finally approached defendant's window at 11:38:06 p.m. (one minute and one second after the stop) (P. Ex. 1). Also, Officer Onik was aware that people have shot at police officers before, and he believed defendant's movements were "kind of quick" (Tr. at 12, 36). Officer Onik was being cautious because of the smell of marijuana coming from the car -- he did not know what was going on inside the car (Tr. at 13, 36).

9. Officer Onik asked defendant to put his hands on the hood of the car, and he asked Officer Becchina to place handcuffs on defendant (Tr. at 13, 55). Officer Onik told defendant he was going to turn off the car and roll up the windows, which he did (Tr. at 13). He ordered a K-9 unit[1], and then explained to defendant why he had stopped him and

---

[1]Officer Edwards, the K-9 officer, was at Armour and Troost searching another car when he got the call to respond to 78th and Troost (Tr. at 73). There are only three dogs in the department trained to detect drugs (Tr. at 70).

why he had been asked to get out of the car at gunpoint (Tr. at 13, 38, 62).  Officer Onik asked defendant if there was anything in the car he needed to know about (Tr. at 14, 56). Defendant relied, "No, man, search it." (Tr. at 14, 23, 28, 29, 56, 87; P. Ex. 1; P. Ex. 4).  In response to the officer's statement regarding the smell of marijuana coming from defendant's car, defendant said he had just finished smoking it and that's why the smell was lingering (Tr. at 30).

10.  Officer Becchina retrieved defendant's driver's license, and Officer Onik went back to the patrol car to conduct a computer check (Tr. at 16).  After Officer Onik called in defendant's name, he returned to defendant and asked him if there was a gun in the car (Tr. at 31). Officer Onik two months earlier had arrested defendant for discharging a firearm at a security guard (Tr. at 31, 39). Defendant said, "No, go ahead and look" (Tr. at 17, 23, 39, 43-44).  The officers did not search the car prior to arrival of the K-9 unit, despite having defendant's consent (Tr. at 17; P. Ex. 1).

11.  Officer Edwards arrived with the drug dog 35 minutes after defendant was first pulled over (P. Ex. 1). About 20 seconds after entering the car, the dog alerted to

8

the driver's side door (Tr. at 18, 74). Inside the door panel, officers found a bundle of white substance which field-tested positive for cocaine, and what appeared to be marijuana (Tr. at 18-19; P. Ex. 1). They also recovered a scale (Tr. at 19).

12. After the field test on the drugs, defendant was placed under arrest (Tr. at 20). He was searched incident to arrest, and police found, along with his cell phone, $686.31 in cash (Tr. at 20-21).

13. The car doors were left open to allow the car to air out, and then the drug dog was brought back in the car to do another sniff search (Tr. at 57). Defendant said to Officer Becchina, "That's all of it, you got it all." (Tr. at 58). This statement was not in response to any question (Tr. at 58).

14. Defendant was taken to the police station (Tr. at 22). At no time at the scene or on the way to the station did defendant withdraw his consent to search his vehicle (Tr. at 23). Officer Onik prepared a written consent to search form which says that the police have no search warrant and that the person can at any time say he or she does not want the police to search any more (Tr. at 21). Officer Onik listed all the items seized from defendant's

9

vehicle (Tr. at 22). This form was not available on the scene, but was prepared in order to inventory the items seized from the Envoy (Tr. at 46). Defendant refused to sign the form (Tr. at 22; P. Ex. 2).

15. Detective Cory Horalek met with defendant at the station and advised him of his Miranda rights (Tr. at 77, 78; P. Ex 4). After he read the rights to defendant, he asked defendant to read them back, asked him if he understood his rights, and then asked him to sign the Miranda form (Tr. at 77, 78; P. Ex. 3; P. Ex. 4). Defendant read his rights, he stated he understood them, he said he would waive his rights, and he signed the Miranda waiver form (Tr. at 78, 79-81; P. Ex. 3; P. Ex. 4).

16. Defendant's interrogation began at 8:40 a.m. and concluded at 9:50 a.m. (Tr. at 82; P. Ex. 3). Detective Horalek asked defendant if he used crack cocaine, and defendant said, "Hell, no." (Tr. at 83). Detective Horalek asked defendant if he sold crack cocaine, and defendant said, "Yes, I did." (Tr. at 83). Defendant said that he gave consent to search his vehicle (Tr. at 87; P. Ex. 4). He also explained that he refused to sign the consent to search form at the police station because the police were "jacking around" and trying to take his money (Tr. at 88; P.

10

Ex. 4).  Defendant said that the drug dog was smart, and
that he has been selling drugs for over ten years and knows
if the dog had not alerted, the police never would have
found his drugs (Tr. at 88).  He also stated that he
believed if the drugs were packaged in a single package
instead of multiple packages, he could only get arrested for
possession and not for trafficking (Tr. at 88).

17.  Defendant was seated next to a steno, and the
steno typed Detective Horalek's questions and defendant's
answers word for word (Tr. at 84).  When the interview was
concluded, the steno printed the transcript and defendant
reviewed it and then signed and initialed each page (Tr. at
84-85).

### III. INITIAL STOP

A law enforcement officer who observes a traffic
offense, however minor, has probable cause to stop the
driver of a vehicle. United States v. Williams, -- F.3d --,
2005 WL 3071208 (8th Cir. (Ark.), November 17, 2005); United
States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004);
United States v. Woodall, 938 F.2d 834 (8th Cir. 1991);
United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991).
A law enforcement officer can even lawfully stop an
automobile merely to warn the driver of a traffic violation.

<u>United States v. Webb</u>, 533 F.2d 391 (8th Cir. 1976); <u>United States v. Geelan</u>, 509 F.2d 737, 743-44 (8th Cir. 1974), <u>cert</u>. <u>denied</u>, 421 U.S. 999 (1975).

Stopping a vehicle for an improperly displayed temporary tag is permitted. <u>United States v. Clayborn</u>, 339 F.3d 700 (8th Cir. 2003); <u>United States v. Peltier</u>, 217 F.3d 608 (8th Cir. 2000).

To determine whether a stop is pretextual, an objective assessment of the officer's actions must be made. <u>Woodall</u>, 938 F.2d at 837; <u>Cortez</u>, 935 F.2d at 142. In this case, Officers Onik and Becchina observed defendant's car with the temporary tag displayed improperly, both by its location and because the writing on the tag was not visible due to the window tint. Officer Onik had an objective and legitimate reason to stop defendant. <u>See</u> <u>Cortez</u>, 935 F.2d at 142. An otherwise valid traffic stop does not become unreasonable merely because the officer has "intuitive suspicions" that occupants of the vehicle are engaged in some sort of criminal activity. <u>United States v. Williams</u>, -- F.3d --, 2005 WL 3071208 (8th Cir. (Ark.), November 17, 2005); <u>United States v. Martinez</u>, 358 F.3d 1005, 1009 (8th Cir. 2004); Woodall, 938 F.2d at 837.

12

Therefore, because the stop of defendant's car by Officers Onik and Becchina was lawful due to the improper placement of the temporary tag, defendant's motion on this basis should be denied.

## IV.   *SNIFF SEARCH BY DRUG DOG*

The use of the drug-sniffing dog on the exterior of a vehicle during a valid traffic stop does not infringe upon any Fourth Amendment rights. <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005); <u>United States v. Williams</u>, -- F.3d --, 2005 WL 3071208 (8th Cir. (Ark.), November 17, 2005).  Officer Onik requested a K-9 unit at 11:37 p.m., and the K-9 unit arrived at 12:12 a.m., 35 minutes later.  This brief wait for the drug-sniffing dog is well within the time frame for finding that the stop was not unreasonably prolonged.  <u>See</u> <u>United States v. White</u>, 42 F.3d 457, 460 (8th Cir. 1994) (eighty-minute wait reasonable); <u>United States v. Bloomfield</u>, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (one-hour period permissible).

Therefore, the amount of time spent waiting for the K-9 unit was acceptable.

## V.   *PROBABLE CAUSE TO SEARCH*

A law enforcement officer who stops a motorist for a traffic violation is justified in requiring the motorist to

13

exit the vehicle for brief questioning and in detaining him briefly outside the vehicle while the officer completes his investigation. New York v. Class, 475 U.S. 106, 116 (1986); Pennsylvania v. Mimms, 434 U.S. 106, 108-111 (1977). During an investigative stop, an officer can take steps reasonably necessary to protect his personal safety and to maintain the status quo. United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000); United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998).

An officer may make a warrantless search of a vehicle based on probable cause. United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003); cf. United States v. Booker, 186 F.3d 1004, 1006 (8th Cir. 1999) (noting a warrantless search of a vehicle after consent has been withdrawn does not violate the Fourth Amendment if officers have probable cause). An officer has probable cause to search a vehicle "when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." Ameling, 328 F.3d at 448 (citation omitted). See also United States v. Brown, 345 F.3d 574, 580 (8th Cir. 2003).

14

When an officer smells marijuana coming from the car during a traffic stop, the officer has probable cause to search the car. <u>United States v. Winters</u>, 221 F.3d 1039, 1042 (8th Cir. 2000); <u>United States v. Peltier</u>, 217 F.3d 608, 610 (8th Cir. 2000); <u>United States v. Portman</u>, 207 F.3d 1032, 1033 (8th Cir. 2000); <u>United States v. Landfair</u>, 207 F.3d 521, 522 (8th Cir. 2000); <u>United States v. McCoy</u>, 200 F.3d 582, 584 (8th Cir. 2000); <u>United States v. Neumann</u>, 183 F.3d 753, 756 (8th Cir. 1999); <u>United States v. Caves</u>, 890 F.2d 87, 89-91 (8th Cir. 1989).

In this case, defendant does not argue that there was no marijuana smell. In fact, he admitted that he had just finished smoking marijuana which is why the smell was lingering. Because it is undisputed that Officer Onik smelled marijuana coming from defendant's car as he approached the driver's window, I find that Officer Onik had probable cause to search the car.

## VI. CONSENT TO SEARCH

Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area. <u>United States v. Matlock</u>, 415 U.S. 164, 171 & n. 7 (1974); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222

15

(1973).  Voluntary consent need not amount to a waiver.

United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

Consent can be voluntary without being an "intentional

relinquishment or abandonment of a known right or

privilege."  Bustamonte, 412 U.S. at 235.  The proper test

is whether the totality of the circumstances demonstrates

that the consent was voluntary.  Id. at 226.

    The government bears the burden of proving a voluntary

consent to search by a preponderance of the evidence.

Bumper v. North Carolina, 391 U.S. 543, 548 (1968); United

States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983).  The

question of whether the consent was voluntarily given is a

question of fact for the trial court.  United States v.

Cortez, 935 F.2d 135, 142 (8th Cir. 1991); United States v.

Alberts, 721 F.2d 636 (8th Cir. 1983).  Consent is voluntary

if it was "the product of an essentially free and

unconstrained choice by its maker" rather than the product

of duress or coercion, express or implied.  Bustamonte, 412

U.S. at 225, 227.  This determination depends upon the

totality of the circumstances in a particular case,

including "both the characteristics of the accused and the

details of the interrogation."  Id. at 226.

16

In this case, the videotape of the traffic stop shows that defendant, although handcuffed for officer safety, appeared very relaxed and was smiling and conversing with the officers.  Almost immediately after defendant got out of the car, Officer Onik asked him if there was anything in the car, and defendant said, "No, man, search it."  When asked if there was a gun in the car, defendant said, "No, go ahead and look."  The officers never even asked defendant for consent to search because he readily gave it almost immediately after having been stopped.  He later provided an explanation for his quick consent -- he told Detective Horalek that if the drug dog had not been so smart, the police never would have found the drugs.  Defendant thought his stash was safe, beyond detection, and that even a search of his car by police would not result in discovery of the cocaine and marijuana.

There is no evidence of duress or coercion, express or implied.

Therefore, for the above reasons, I conclude that even if the officers had not had probable cause to search the car, defendant voluntarily consented to the search.

*VII. VOLUNTARINESS OF CONFESSION*

Finally, defendant argues that his statement was the product of coercion.  Specifically, defendant argues, "The length and nature of defendant's custody, and the duration and nature of defendant's interrogation and the conditions under which it was conducted, were inherently coercive as applied to a person of defendant's education, background, and physical and mental condition at the time such interrogation occurred."  This argument is without merit.

The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his <u>Miranda</u> rights.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 158 (1986); <u>United States v. Dougherty</u>, 810 F.2d 763, 772 (8th Cir. 1987).  There is no requirement that, to be voluntary, the waiver be the product of a free will.  <u>Connelly</u>, 479 U.S. at 170.  The sole concern of the Fifth Amendment, upon which <u>Miranda</u> was based, is governmental coercion.  <u>Id.</u>; <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977).  The voluntariness of a waiver of this privilege depends on the absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation,

18

coercion or deception.  <u>Connelly</u>, 479 U.S. at 170; <u>Moran v.</u>
<u>Burbine</u>, 475 U.S. 412, 420 (1986); <u>Fare v. C.</u>, 442 U.S. 707,
726-27 (1979).

An explicit statement of waiver is not invariably
necessary to support a finding that the defendant waived his
<u>Miranda</u> rights.  <u>North Carolina v. Butler</u>, 441 U.S. 369
(1979).  An express written or oral statement of waiver of
<u>Miranda</u> rights is usually strong proof of the validity of
that waiver, but is not inevitably either necessary or
sufficient to establish waiver.  <u>Id</u>. at 373.

> The question is not one of form, but rather whether the
> defendant in fact knowingly and voluntarily waived his
> rights delineated in the <u>Miranda</u> case.  As was
> unequivocally said in <u>Miranda</u>, mere silence is not
> enough.  That doesn't mean that the defendant's
> silence, coupled with an understanding of his rights
> and course of conduct indicating waiver, may never
> support a conclusion that a defendant has waived his
> rights. . . .  [I]n at least some cases waiver can be
> clearly inferred from the actions and words of the
> person interrogated.

<u>Id</u>. at 373.

Whether a defendant waived his <u>Miranda</u> rights is a
question of fact for the trial judge and must be determined
on the particular facts and circumstances surrounding the
case, including the background, experience and conduct of
the accused.  <u>Id</u>. at 374; <u>United States v. Dougherty</u>, 810
F.2d 763, 772 (8th Cir. 1987); <u>Stumes v. Solem</u>, 752 F.2d

19

317, 319 (8th Cir. 1985). The totality of the circumstances test applies. Dougherty, 810 F.2d at 773.

In this case, defendant was advised of his Miranda rights at the police station. Detective Horalek read the rights to defendant, defendant read the rights again to himself, he stated that he understood his rights, he said he wished to waive those rights, and he signed the Miranda waiver form. In addition, defendant initialed and signed the typed statement, setting out word-for-word the questions and answers of Detective Horalek and defendant. Specific-ally in that form, defendant initialed the statements indicating that he had been advised of his Miranda rights (also stating what those rights are) and that he wishes to waive those rights.

The questioning of defendant lasted a mere one hour and ten minutes. This is not particularly lengthy for an interrogation. See Jenner v. Smith, 982 F.2d 328, 334 (8th Cir. 1993) (questioning a suspect for six or seven hours is not unconstitutionally coercive per se). Although defendant argued that the nature of defendant's custody, the nature of defendant's interrogation, and the conditions under which the interrogation were conducted were inherently coercive, defendant offered no evidence at all on any of these

20

factors.  He argued that the nature of the custody and interrogation "applied to a person of defendant's education, background, and physical and mental condition at the time such interrogation occurred" were inherently coercive.  But again, defendant offered no evidence of defendant's education, background, physical or mental condition.[2]

Based on all of the above, I find that defendant was advised of his <u>Miranda</u> rights, he voluntarily waived those rights, and he voluntarily provided a statement to police. Therefore, defendant's motion to suppress his statements should be denied.

## VIII. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through VII, I make the following conclusions of law:

1.  The initial stop of defendant's vehicle was lawful because police observed that his temporary tag was not displayed properly, an officer may pull a car over for an improperly displayed temporary tag, and the officer's

---

[2]I point out that according to the Pretrial Services Report, defendant is 30 years of age, he has an 11th grade education, he has worked for A-Arnold Construction Company for the past seven years, and he told Pretrial Services that he is in good physical and mental health.

Case 4:05-cr-00288-DW   Document 36   Filed 12/05/05   Page 21 of 23

subjective intent in pulling the car over is irrelevant so long as there is an objectively lawful reason for the stop.

2.   Officer Onik's ordering defendant out of the car was permissible since a law enforcement officer who stops a motorist for a traffic violation may require the motorist to exit the vehicle for brief questioning and in detaining him briefly outside the vehicle while the officer completes his investigation.

3.   Officer Onik was justified in drawing his weapon because during an investigative stop, an officer can take steps reasonably necessary to protect his personal safety and to maintain the status quo, and in this case Officer Onik suspected defendant may be reaching for a weapon.

4.   The time spent waiting for the K-9 unit was not unreasonably long.

5.   Officer Onik had probable cause to search defendant's car because of the strong smell of marijuana emanating from the car.

6.   Defendant voluntarily consented to the search of his car.

7.   Defendant knowingly and voluntarily waived his Miranda rights and provided a voluntary statement to Detective Horalek.

Based on all of the above, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress statements and his motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 5, 2005

23